UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK P. HURLEY and JA BROOKVIEW LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:19-CV-0011-B |
| EMIGRANT BANK, HOWARD MILSTEIN, BARRY FRIEDBERG, ALAIN LEBEC, JOHN SANDERS, GREGG FRIEDMAN, and KARL HECKENBERG, | § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Compel Arbitration and Stay Proceedings (Doc. 31). After reviewing the parties' briefing and applicable law, the Court **GRANTS** the motion.

## I.

## BACKGROUND

*A. Factual Background*

This dispute arises from the aftermath of a company's forced sale and subsequent purchase. The company, Fiduciary Network, LLC, was a joint venture between Mark P. Hurley and EB Safe, LLC. Doc. 1, Notice of Removal, 2. Hurley and EB Safe formed Fiduciary Network to provide long-term financing for wealth management firms. *Id.* Fiduciary Network is governed by an LLC Agreement.[1] The question before the Court is whether an arbitration provision in this Agreement

---

[1] The LLC Agreement has been amended a few times over Fiduciary Network's existence. The relevant agreement for purposes of this dispute is the third amended version. Doc. 28, Am. Compl., 6 n.6.

can be relied upon by the Defendants in this case, who never signed the Agreement, to compel arbitration against Hurley, who did sign the Agreement. But before turning to that issue, the Court introduces the parties and entities that are involved in this dispute.

The case is brought by Mark Hurley and his LLC, JA Brookview.[2] Doc. 28, Am. Compl., 1. In 2006, Hurley and EB Safe LLC cofounded Fiduciary Network. Doc. 34, Mot. to Compel, 2. EB Safe is a wholly owned subsidiary of Emigrant Bank, a private depository institution. Doc. 28, Am. Compl., ¶ 16. Emigrant Bank is owned and operated by Howard Milstein. *Id.* Hurley and Milstein negotiated the LLC Agreement that formed Fiduciary Network. *Id.* ¶ 17. At the times relevant to this lawsuit, Fiduciary Network had a seven-member board: EB Safe controlled five of the seats and Hurley controlled two. *Id.* EB Safe appointed as directors Barry Friedberg, Alain Lebec, John Sanders, Gregg Friedman, and Karl Heckenberg (referred to together as, "director Defendants," below). *Id.*

The arrangement was that EB Safe provided the capital to start Fiduciary Network, while Hurley managed the day-to-day operations. *Id.* at 2–3. EB Safe received a 75% membership interest, while Hurley and his management team received the remaining 25%. *Id.* at 6–7. Hurley retained around 19% for himself and his related entities.[3] Doc. 34, Defs.' Br., 3 (citing Ex. 14 to Doc. 28, Am. Compl.).

Hurley's amended complaint goes on to detail the tumultuous history of Fiduciary Network, which ultimately led to a forced-sale process that Hurley triggered under the LLC Agreement. The Court need not wade into these allegations to resolve this motion. Suffice to say, the LLC Agreement

---

[2] The members of JA Brookview LLC are Hurley, his ex-wife, and his five children. Doc. 1, Notice of Removal, ¶ 9.

[3] Hurley himself held a 12.354% interest; JA Brookview received a 6.302% share; and the Hurley Trust received a 0.249% interest. Doc. 34, Defs.' Br., 3.

provided Hurley with the right to initiate a forced sale of his membership interest in Fiduciary Network. Doc. 41, Pls.' Resp., 3 (citing Ex. 14 to Doc. 28, Am. Compl.). And EB Safe was given a right of first refusal where it could buy Hurley's membership interest at the end of the sales process if it matched the price of the highest bidder. *Id.* Hurley triggered his forced-sale right in November 2016. *Id.* This started the sales process under which a third-party investment banker was selected to solicit bids and maximize the value of membership interests. *Id.* Ultimately, on November 20, 2018, the sales process closed, and EB Safe exercised its right of first refusal to purchase Hurley's membership interest. *Id.* at 4. EB Safe then terminated Hurley as CEO. *Id.*

Hurley alleges that EB Safe "engaged in numerous wrongful acts" to either stop the sales process or to artificially lower the price of Hurley's membership interest so that it could make a matching bid at the end of the sales process. *Id.* at 3. As Hurley puts it, Milstein led "a multi-year scorched-earth campaign . . . to wrest control of a once-successful business (for pennies on the dollar) by disrupting its contractual relationships and disparaging its founder." Doc. 28, Am. Compl., 1. Hurley's specific claims here essentially stem from this general allegation.

B.    *Procedural Background*

This is not the first action the parties have brought that relates to this dispute. It started in December of 2017, when EB Safe commenced an arbitration proceeding against Hurley, seeking to preclude Hurley from bidding on his own membership interest in the sale process. Doc. 41, Pls.' Resp., 3. At some point during that proceeding, EB Safe's board attempted to suspend Hurley as CEO pending an investigation related to Hurley's personal affairs. *Id.* at 3–4. Hurley challenged his suspension in the arbitration and won. *Id.* EB Safe then filed an emergency petition in New York state court, arguing that the arbitration panel exceeded its authority in granting Hurley's

request for relief because it improperly extended its jurisdiction to matters concerning EB Safe's directors. *Id.* The New York court rejected this argument. *Id.*

Next, Fiduciary Network brought its own suit against Hurley in New York state court. *Id.* at 5. Fiduciary Network claimed that Hurley was not entitled to indemnification for attorneys' fees and costs associated with defending against his investigation and suspension. *Id.* Fiduciary Network also claimed Hurley was interfering with its current and prospective business relations through the sales process. *Id.* Specifically, Fiduciary Network claimed that Hurley triggered the sales process to find a new financing partner that he could partner with. *Id.* But once it was clear he wouldn't be the highest bidder, Hurley allegedly attempted to intimidate portfolio companies from working with Fiduciary Network. *Id.*

Hurley subsequently removed the action to the Southern District of New York. *See Fiduciary Network LLC v. Hurley*, Civ. Action No. 1:19-cv-0379-GHW (S.D.N.Y. Jan. 14, 2019). That case is still pending.

And then we get to the case before the Court. Hurley filed his original petition in this case on December 7, 2018, in Texas state court. Doc. 1, Notice of Removal, 1–2. That petition named as defendants Emigrant Bank, Milstein, and the other EB Safe directors listed above. *Id.* The petition also named EB Safe as a defendant and brought derivative claims on behalf of Fiduciary Network. *Id.* The petition alleges the following claims:

1. Tortious Interference with Prospective Business Relations (against EB Safe);

2. Derivative Claim for Tortious Interference (against EB Safe, Emigrant Bank, and Milstein);

3. Defamation Per Se;

4. Business Disparagement;

5. Derivative Claim for Breach of Fiduciary Duty (against Freidberg, Lebec, Sanders, Freedman, Heckenberg, and against EB Safe, Emigrant Bank, and Milstein); and

6. Civil Conspiracy (against EB Safe, Milstein, Friedberg, Lebec, Sanders, Freedman, and Heckenberg).

*Id.* at 3. On January 3, 2019, Defendants removed to this Court on the basis of diversity. *Id.*

Then, on January 10, 2019, Defendants filed a motion to compel arbitration and stay proceedings based on the arbitration clause in the Fiduciary Network LLC Agreement. Doc. 6, Mot. to Compel. Instead of filing a response, Plaintiffs chose to amend their complaint. *See* Doc. 28, Am. Compl. In their amended complaint, Plaintiffs no longer name EB Safe as a Defendant. In fact, Plaintiffs have seemingly removed all allegations and references related to EB Safe and instead attribute their previous allegations to Emigrant Bank and the other Defendants. Plaintiffs have also removed any derivative claims on Fiduciary Network's behalf.

Defendants then filed a renewed motion to compel arbitration based on the allegations in the amended complaint. Doc. 31, Mot. to Compel. All briefing has been submitted, and the motion is now ripe for the Court's consideration.

## II.

## LEGAL STANDARD

In enacting the Federal Arbitration Act (FAA), "Congress . . . expressed a strong policy favoring arbitration before litigation." *J.S. & H. Constr. Co. v. Richmond Cty. Hosp. Auth.*, 473 F.2d 212, 214–15 (5th Cir. 1973). Under the FAA, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The Fifth Circuit follows a two-step procedure to decide whether to compel arbitration: (1) determine "whether the parties agreed to arbitrate the dispute in question," and (2) determine whether any external legal constraints foreclose arbitration of the dispute. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir. 1996) (per curiam). "In determining the contractual validity of an arbitration agreement, courts apply ordinary state-law principles that govern the formation of contracts." *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004).

In conducting the first step of the analysis—whether the parties agreed to arbitrate the dispute in question—a court will find an agreement where: (1) there exists between the parties "a valid agreement to arbitrate," and (2) the "dispute in question falls within the scope of that arbitration agreement." *Webb*, 89 F.3d at 258. Ordinarily, the second question is one for the court, but where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the second question is for the arbitrator. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201–02 (5th Cir. 2016). "If the court finds that there is 'clear and unmistakable' evidence that the parties intended to arbitrate arbitrability, and, thus, that there is a valid delegation clause, 'the motion to compel arbitration should be granted in almost all cases.'" *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017) (quoting *Kubala*, 830 F.3d at 202).

## III.

## ANALYSIS

A.  *Whether Defendants May Enforce the Arbitration Provision Even Though They Are Not Parties to the Agreement*

The central issue here is whether there is a valid arbitration agreement between the parties. The court must decide this inquiry at the outset. *See Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921

F.3d 508, 514 (5th Cir. 2019).

Plaintiffs argue that there is not a valid arbitration agreement between the parties because none of the Defendants are parties to the LLC Agreement, which contains the arbitration clause. Doc. 41, Pls.' Resp., 11–13. Defendants do not dispute that they did not sign the LLC Agreement. Doc. 34, Mot. to Compel, 6–10. Nonetheless, they argue the Court should compel arbitration because Plaintiffs are equitably estopped from avoiding it. *Id.* Applying ordinary Delaware[4] state-law principles governing contract formation, the Court finds that a valid arbitration agreement exists.

The question is when a nonsignatory (or nonsignatories) to an arbitration agreement can compel signatories to arbitrate. "Delaware law allows a nonsignatory to a contract to compel a signatory to arbitrate under an equitable estoppel theory." *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, 2006 WL 2473665, at *4 (Del. Ch. Aug. 22, 2006). A court can compel arbitration under this theory in two circumstances:

1. When the signatory to the arbitration agreement must rely on the terms of the written agreement in asserting claims against the nonsignatory; or

2. When the signatory to the arbitration agreement raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

*Id.* at *5 (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). Defendants argue either basis provides a ground for compelling arbitration here.

1.     Whether Plaintiffs rely on the terms of the LLC Agreement in asserting their claims

Starting with the first scenario, Defendants assert "there can be no dispute that Plaintiffs'

_____

[4] The parties seem to agree that Delaware law governs this dispute based on a choice-of-law clause in the LLC Agreement. *See* Doc. 34, Defs.' Br., 8; Doc. 41, Pls.' Resp., 9 n.48.

claims rely on the terms of the LLC Agreement." Doc. 34, Mot. to Compel, 9. Before the Court gets to that issue, it must first address the parties' dispute over what standard applies to determine if a claim relies on the terms of an arbitration agreement. Defendants contend that a party's claims "rely on" the terms of an agreement when they refer to or presume the existence of the written agreement. *Id.* (citing *Wilcox & Fetzer*, 2006 WL 2473665, at *5). Plaintiffs, on the other hand, argue that it's not sufficient under Delaware law to merely show that the claims "make reference to or presume the existence of" an arbitration agreement; rather, they argue that Delaware courts look to whether a nonsignatory's liability may be determined without looking to the arbitration agreement or whether resolution of the claims is "dependent on parsing out the terms" of that agreement. Doc. 41, Pls.' Resp., 17–19 (citing *Incyte Corp. v. Flexus Biosci., Inc.*, 2016 WL 1735485, at *6 (Del. Super. Ct. Apr. 19, 2016)). In reply, Defendants assert (1) that the cases Plaintiffs cite still apply the standard from *Wilcox*, but regardless (2) that Plaintiffs' reformulation of the equitable estoppel standard is irrelevant because their claims still "rely on" the terms of the LLC Agreement. Doc. 42, Defs.' Reply, 6–7.

The Court agrees with Defendants that Delaware courts continue to employ the standard from *Wilcox* that was originally developed by *Grigson* and *Franklin*. The cases on which Plaintiffs rely make that much clear. *See Incyte Corp.*, 2016 WL 1735485, at *4–5 (directly quoting the *Wilcox/Grigson* standard in full); *Charter Oak Fire Ins. Co. v. McClafferty Printing Co., Inc.*, 2008 WL 4152773, at *2–3 (Del. Super. Ct. Aug. 27, 2008) (citing *Wilcox*). Plaintiffs' attempt to strictly limit the standard to the one phrase from *Incyte Corp.* is unavailing—Delaware Courts continue to employ *Grigson*'s equitable estoppel test, so this Court will too.

Moving on, the Court must determine whether Plaintiffs' claims "rely on"—*i.e.*, whether they refer to or presume the existence of—the LLC Agreement. Defendants argue this is the case because

each claim makes reference to the LLC Agreement and, more specifically, the forced-sale process that occurred according to the terms of the LLC Agreement. Doc. 34, Mot. to Compel, 10–14. In response, Plaintiffs argue that equitable estoppel does not apply to five of their claims—defamation, business disparagement, tortious interference, civil conspiracy, and aiding and abetting—because these claims are tort claims, not contract claims. Doc. 41, Pls.' Resp., 17. As for the breach-of-fiduciary-duty claim, Plaintiffs argue this claim "arise[s] independently of the LLC Agreement" and thus does not rely on it. *Id.* at 18.

The Court finds that Plaintiffs' claims refer to or presume the existence of the LLC Agreement here, and more specifically, the sales process that occurred pursuant to the Agreement. For instance, with respect to his business disparagement and tortious inference claims, Hurley alleges that Defendants made false statements with "the intent of damaging Hurley's business with Fiduciary Network and the Forced Sales Process." Doc. 28, Am. Compl., ¶ 88; *see also id.* ¶ 113. And the same goes for Hurley's aiding and abetting and civil conspiracy claims. *Id.* ¶¶ 117, 123. Hurley's defamation per se claim relates closely to the operation and performance of Fiduciary Network, which is governed by the LLC Agreement, and its performance predictions that were made in relation to the sales process. *Id.* ¶¶ 80–82.[5] Plaintiffs' argument that they are not equitably estopped from avoiding arbitration on these claims because they have avoided mentioning the LLC Agreement in their pleadings is unavailing; indeed, in this situation, equitable estoppel

---

[5] Although not argued by Plaintiffs, it does seem that their defamation claim has less of a nexus to the LLC Agreement than their other claims have, as this claim does not specifically allege that false statements or omissions were made with the intent to suppress the value of Hurley's membership interest during the sales process. *See* Doc. 28, Am. Compl., ¶¶ 72–83. Nonetheless, when examined in light of the factual background provided in the complaint, the defamation claim clearly stems from statements made in relation to the sales process and Hurley's role at Fiduciary Network.

prevents parties from artfully pleading claims to avoid arbitration. *See Grigson*, 210 F.3d at 530; *see also infra* § III.A.2. Clearly, these claims presume the existence of the LLC Agreement and the forced-sale process that Hurley himself invoked under the Agreement, as was his right. But Hurley cannot now disclaim another provision in the same Agreement because it is to his advantage. *See Grigson*, 210 F.3d at 528 (noting that equitable estoppel is applied where it would be inequitable to both rely on and disclaim provisions in an agreement). These claims are sufficiently intertwined with the LLC Agreement to find that equitable estoppel applies.

And the same is true of Plaintiffs' fiduciary-duty claim. Plaintiffs bring this claim solely against Emigrant Bank, "the majority member and controlling person of the majority members of the board" of Fiduciary Network. Doc. 28, Am. Compl., ¶ 97. Plaintiffs argue Emigrant breached its fiduciary duties to Plaintiffs by forcing Plaintiffs out of Fiduciary Network at a price that was substantially below market value. *Id.* ¶ 99. Defendants argue this claim is interwoven with § 6.7(f) of the LLC Agreement, which provides that: "no Manager, Member, or Senior Employee shall be deemed to have breached his or her duty of loyalty to the Company or the Members . . . with respect to any action or inaction in connection with or relating to any transaction that was approved in accordance with, or contemplated by, the terms hereof." Doc. 34, Defs.' Br., 12 (citing Ex. 14 to Doc. 28, Am. Compl.). Despite Plaintiffs' argument that fiduciary duties sometimes arise independently of LLC agreements, in this case, it seems that the parties' duties are governed by the terms of this LLC Agreement. The Court agrees with Defendants that resolution of Plaintiff's fiduciary-duty claim will inevitably butt up against the LLC Agreement.

In sum, the Court finds that the first theory of equitable estoppel applies here. But, as the *Grigson* court noted, "equitable estoppel is much more readily applicable when the case presents both

independent bases . . . ." 210 F.3d at 527. Thus, the Court turns to the second estoppel scenario.

<u>2.</u>     <u>Whether Plaintiffs have raised allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories</u>

Courts also apply equitable estoppel to compel nonsignatories to arbitrate when the signatories' claims raise allegations of substantially interdependent and concerted misconduct by both nonsignatories and signatories to the arbitration agreement. *Wilcox & Fetzer*, 2006 WL 2473665, at *5 (citing *Grigson*, 210 F.3d at 527–29). Based on Plaintiffs' allegations in their amended complaint, especially when considered against the allegations of their original complaint, the Court finds support for this theory as well.

Defendants admit that Plaintiffs' operative complaint no longer explicitly alleges that EB Safe, the other signatory to the LLC Agreement, committed any wrongs. Doc. 42, Defs.' Reply, 9. Nonetheless, Defendants argue that the Court can apply equitable estoppel against Plaintiffs on this ground because Plaintiffs have intentionally amended their complaint in a way to avoid arbitration. *Id.* The original complaint that Plaintiffs filed in state court named EB Safe as a defendant. *See* Doc. 5, Ex. F to Notice of Removal, Pls.' Original Pet., 1. Considered on its own, this original complaint undoubtedly alleges interdependent and concerted misconduct by the currently named Defendants and EB Safe. *See id.* at 1–2 & ¶¶ 81, 89, 116, 127, 136, 145–50. The original complaint generally alleges that Milstein, operating through EB Safe and Emigrant Bank, directed the other named Defendants to instigate litigation and publish misstatements about Fiduciary Network and Hurley. *See id.* ¶ 81. And "these bad-faith dilatory tactics had Milstein's desired effect of eliminating the competition and wresting control of FN from its founder [Hurley] for pennies on the dollar." *Id.* Hurley specifically alleges that EB Safe:

. . . controlled the actions of defendants Friedberg, Lebec, Sanders, Freedman, and

Heckenberg respecting their management of FN. Defendant Emigrant Bank controlled the actions of defendant EB respecting its membership in FN. Defendant Milstein controlled Emigrant Bank respecting its management of EB.

*Id.* ¶ 89. Moreover, each substantive claim alleged in this complaint, except for count one, alleges some sort of interdependent and concerted misconduct by the signatory EB Safe, and the nonsignatories Emigrant Bank, Milstein, and the other named Defendants. *See, e.g., id.* ¶ 113 ("Milstein, Emigrant Bank, and EB, acting through the EB-appointed members of FN's Board, who constituted a majority of the Board, acted maliciously with the intent and purpose of harming Fiduciary Network."); *see also id.* ¶¶ 116, 124, 127, 136, 143, 145–50 (either generally alleging conduct by all "defendants" or alleging that EB Safe acted "by and through its officers and agents," *i.e.* the other named Defendants).

Turning to the amended complaint, Plaintiffs have removed almost all references to EB Safe.[6] Instead, the amended complaint refers to Emigrant Bank as "EB," and mentions EB Safe only once, which it calls a "shell subsidiary company" of Emigrant. Doc. 28, Am. Compl., 1, 6. But the amended complaint still alleges that Defendants engaged in concerted wrongdoing while working as the directors/managers of EB Safe. *See, e.g., id.* ¶¶ 73, 85, 93, 117, 123. Plaintiffs bring both civil conspiracy and aiding and abetting claims against all Defendants in relation to the forced-sale process of FN. *Id.* ¶¶ 117, 123. With respect to civil conspiracy, Plaintiffs allege that all "Defendants agreed and conspired among themselves to intentionally interfere with plaintiffs' business relations and

---

[6] While Plaintiffs referred to EB Safe as simply "EB" in the original petition, they now refer to Emigrant Bank as "EB." *Compare* Doc. 5, Ex. F. to Notice of Removal, 4 *with* Doc. 28, Pls.' First Am. Compl., 1. But this seems like a hurried attempt to obfuscate in the amended complaint the fact that Emigrant and EB Safe are two separate entities. Indeed, remnants of allegations against EB Safe remain in the amended complaint. *See, e.g.,* Doc. 28, Pls.' First Am. Compl., ¶ 61 ("But in January 2018, when Emigrant and EB wanted to frustrate the sale process, they took action to ***destroy*** the value of Plaintiffs' membership interest."). This paragraph is identical to paragraph 74 in the original complaint. *See* Doc. 5, Ex. F to Notice of Removal, ¶ 74.

opportunities by acting in concert to commit such overt and unlawful acts." *Id.* ¶ 117. Defendants allegedly conspired to commit such acts "with the goal of diminishing third-party interest in FN and preventing future transactions from occurring so as to diminish FN's future valuation and bid price." *Id.* The aiding-and-abetting count mirrors this language. *See id.* ¶ 123. Thus, the same broad strokes remain from the original complaint—specifically, Plaintiffs allege that Milstein, through Emigrant Bank and the directors he appointed to Fiduciary Network, directed a misinformation campaign to defame and disparage Hurley so they could buy back his membership interests at a deflated price. And the difference is that instead of focusing these allegations at EB Safe, Plaintiffs redirect much of the focus to the entity Emigrant Bank. *See supra* note 6.

To the Court, this appears to be no more than a litigation tactic employed to avoid arbitration. Courts have weighed similar instances in favor of compelling arbitration. For example, in *Grigson*, the court considered the signatory plaintiff's attempt to bypass arbitration by voluntarily dismissing its first complaint and filing a second complaint in the same court. 210 F.3d at 530–31. In the first action, the plaintiff sued the other signatory to an agreement that contained an arbitration provision. After that signatory defendant moved to compel arbitration based on the provision, the plaintiff voluntarily dismissed the action. *Id.* at 530. Then, the plaintiff filed a second action, this time dropping the signatory defendants from the suit and suing only nonsignatories as defendants for tortious interference of the distribution agreement. *Id.* In analyzing whether the plaintiff was equitably estopped from avoiding arbitration, even though the new defendant did not sign the arbitration agreement, the court held that this was "a quite obvious, if not blatant attempt to bypass the agreement's arbitration clause." *Id.* The court reasoned that the two actions were essentially the same in that both alleged wrongdoing by the first defendant, even though it was

unnamed in the second action. *Id.* at 530. Ultimately, the court held that "comparison of the two actions demonstrates, quite vividly, why the district court, which presided over both actions, did not abuse its discretion in compelling arbitration in the second, by applying the equitable estoppel doctrine . . . ." *Id.* at 530–31 (emphasis omitted). And as Defendants point out, at least one other court has applied *Grigson*'s reasoning to a case where a plaintiff voluntarily amends its complaint to eliminate its claims against a signatory but leaves claims against a nonsignatory. *See* Doc. 42, Defs.' Reply, 9 (citing *Bank One Ariz. v. Wilton Hurst G.P. Corp.*, 2001 WL 276891, at *2 (N.D. Tex. Mar. 19, 2001) (holding that "fairness dictates [the signatory plaintiff] be compelled to arbitrate its claims against [the nonsignatory defendant]")).

Plaintiffs have two arguments to challenge this ground: first, their amended complaint does not allege concerted misconduct by EB Safe; and second, even if it does, the alleged misconduct does not relate to the arbitration agreement. Doc. 41, Pls.' Resp., 20–21. The Court does not find merit in either argument. The first is addressed by the Court's discussion above that showed how courts look disfavorably on attempts to plead around arbitration. And, like the amendments in *Grigson* and *Bank One Arizona*, the amendment here seems to be a rather obvious attempt to plead around the arbitration provision.[7] The Court thus weighs Plaintiffs' removal of EB Safe from the amended

---

[7] Morever, both federal and state courts are generally hostile towards attempts to artfully plead around arbitration:

> Hays treats Austin Heart, CAC, and HAC as a single unit in his pleadings, raising virtually indistinguishable factual allegations against CAC and Austin Heart in arbitration and against HCA here. His complaint in this action and his counter-demand in arbitration use almost identical language, substituting only the names of the defendants. . . . Hays's current efforts to distinguish amongst defendants and claims are the archetype of strategic pleading intended to avoid the arbitral forum, precisely what intertwined claims estoppel is designed to prevent.

*Hays v. HCA Holdings, Incorp.*, 838 F.3d 605, 612–13 (5th Cir. 2016) (internal citations omitted) (citing

complaint against them in this analysis. As for the second argument—that the alleged misconduct does not relate to the LLC Agreement—the Court addressed it in the first part of the analysis section above: Plaintiffs' claims all relate to the forced-sale process, a right Hurley exercised and carried out according to the LLC Agreement.

A final point to note is that Plaintiffs' position in this motion is arguably inconsistent with a position they took in previous litigation. The parties dispute this in their briefing. The previous litigation was the suit for emergency relief brought in New York state court by EB Safe and the individual Defendants named here. EB Safe and the Defendants sought to stay Hurley's counterclaims in an ongoing arbitration proceeding. Hurley opposed the stay, arguing that the individual Defendants were bound by the arbitration agreement, even though they did not sign it, because they were "one and the same with EB [Safe]." Doc. 42, Defs.' Reply, 1–2 (citing Oral Argument Transcript from New York court hearing on motion to stay). The New York judge agreed with Hurley and denied EB Safe and the individual Defendants' petition. The court held that "the Tribunal may proceed to hear the claim even though the individual Board members are not signatories to the [LLC] Agreement" *Id.* Based on Hurley's position in this litigation, Defendants argue that Plaintiffs are judicially estopped from now arguing that Defendants are not entitled to arbitrate the claims brought in this Court. Doc. 34, Defs.' Mot., 15. Plaintiffs respond that: (1)

---

*Smith/Enron Cogeneration Ltd. P'Ship v. Smith Cogeneration Int'l Inc.*, 198 F.3d 88, 98 (2d Cir. 1999) (affirming arbitration order where the plaintiff treated nonsignatory companies and their signatory assignees as a "single unit in its complaint")); *see also Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 159 (Del. 2002) ("The Vice Chancellor correctly engaged in an analysis to scrutinize causes of action carefully to search out artfully pleaded claims that attempt to avoid the arbitration clause to which the plaintiffs have agreed.") *and In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 188 (Tex. 2007) ("[P]arties to an arbitration agreement may not evade arbitration through artful pleading, such as by naming individual agents of the party to the arbitration clause and suing them in their individual capacity." (quoting *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1318 (11th Cir. 2002))).

Delaware law does not recognize this form of estoppel as an exception; and (2) Hurley never actually sought to *compel* arbitration against the individual director Defendants. Doc. 41, Pls.' Resp., 14. Instead, he purportedly argued that "the fact Defendants were not signatories to the LLC Agreement had no bearing on whether the arbitrators had jurisdiction over them because EB's position . . . was meritless." *Id.* at 14–15.

Whether or not Delaware recognizes judicial estoppel in this situation, the Court does not believe this previous litigation significantly sways the equities of the situation here. While Hurley's position in this case is arguably inconsistent, the procedural posture does not directly correlate: here, the Court is deciding a motion to compel brought solely by nonsignatories, while there the court was deciding whether the arbitrator had the authority to decide certain claims brought against nonsignatories, as well as signatories, that were already in arbitration. Further, as Plaintiffs point out, individual Defendants' position here may too be inconsistent with their position taken in the New York litigation—there, the Defendants argued that the arbitrator did not have authority to decide certain claims brought against them because they were nonsignatories to the LLC Agreement. This, of course, is the opposite of what they argue here. Because both parties seem to have taken contradicting positions in this litigation, the Court will not weigh this judicial-estoppel argument in either parties' favor.

To sum up, the Court finds that both scenarios of the equitable-estoppel test that Delaware courts apply have been met: Defendants have shown that Plaintiffs' claims make reference to or presume the existence of the LLC Agreement and that Plaintiffs raise allegations of substantially interdependent and concerted misconduct by both the named Defendants (nonsignatories) and EB Safe (a signatory). Additionally, courts have been more willing to compel arbitration when it is a

nonsignatory seeking to compel a signatory to arbitrate, as opposed to the reverse. And finally, the Court finds that Plaintiffs' rather obvious attempt to avoid arbitration through artful pleading pushes the scales more strongly in Defendants' favor. Thus, the Court holds that Defendants can compel Plaintiffs to arbitrate pursuant to the LLC Agreement's arbitration provision and that a valid arbitration agreement exists between the parties.[8]

B.     *Whether the Arbitration Agreement Contains a Valid Delegation Clause*

As noted above, the first step in deciding whether to submit a case to arbitration is determining whether a valid arbitration agreement exists. *Lloyd's Syndicate 457*, 921 F.3d at 514 (citing *IQ Prod. Co.*, 871 F.3d at 348). Because the Court has held that to be the case, the second step is deciding whether the parties' arbitration agreement contains a valid delegation clause. *Id.* This step is "limited: the court must determine whether the agreement contains a valid delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *IQ Prod. Co.*, 871 F.3d at 348 (internal quotations omitted) (quoting *Kubala*, 830 F.3d at 202). "If the court finds that there is clear and unmistakable evidence that the parties intended to arbitrate arbitrability, and, thus, that there is a valid delegation clause, the motion to compel

---

[8] Plaintiffs make the alternative argument that the LLC Agreement, and thus the arbitration provision, has terminated and therefore is no longer valid. Doc. 41, Pls.' Resp., 24–26. Specifically, they argue that the LLC Agreement terminated on November 20, 2018, when EB Safe acquired Fiduciary Network and that no provisions in the Agreement survive termination except for § 6.7, which states explicitly that it "shall survive any termination of this Agreement." *Id.* at 25 (citing Doc. 28-2, Ex. 14 to Am. Compl., § 6.7). However, Plaintiffs are arguing for the implicit nonsurvivability of the arbitration clause based on § 6.7's explicit carve-out. This is not sufficient to negate presumptions of arbitrability. *See Richland Equip. Co., Inc. v. Deere & Co.*, 745 F. App'x 521, 524 (5th Cir. 2018) ("Further, the termination of an agreement containing an arbitration clause does not automatically extinguish the parties' duty to arbitrate disputes." (citing *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 251 (1977))). In *Nolde Bros*, the Supreme Court refused to infer from a contract's silence that the parties intended to forgo arbitration upon the contract's termination. 430 U.S. at 252–53. Because the LLC Agreement here does not evince the parties' intent to terminate arbitral duties with the contract, the Court rejects Plaintiffs' argument.

arbitration should be granted in almost all cases." *Id.* (internal quotations omitted).

Defendants argue that there is a valid delegation clause because the arbitration agreement expressly incorporates the Commercial Arbitration Rules of the Center for Public Resources ("CPR"). Doc. 34, Defs.' Mot., 14–15. They rely on *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671 (5th Cir. 2012) for this argument. In *Petrofac*, the Fifth Circuit held that when the parties expressly incorporated the American Arbitration Association ("AAA") Rules into their arbitration agreement, that can be considered "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." 687 F.3d at 675 (siding with the majority of circuits that have held the same). Here, the arbitration provision provides:

> Any dispute, claim or controversy arising out of or relating to the rights or obligations of the parties under this Agreement, or the interpretation or breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the Center for Public Resources.

Doc. 28-2, Ex. 14 to the Am. Compl., 38 § 10.4 (Dispute Resolution Provision to LLC Agreement). As Defendants point out, these rules provide that:

> The Tribunal shall have the power to hear and determine challenges to its jurisdiction including any objections with respect to the existence, scope or validity of the arbitration agreement. This authority extends to jurisdictional challenges with respect to both the subject matter of the dispute and the parties to the arbitration.

Doc. 34, Defs.' Mot., 15 (citing CPR Rules 8.1 and 8.2). This closely resembles the AAA rule that the Fifth Circuit held was sufficient to show unmistakable evidence of the parties' intent to arbitrate arbitrability. *See Petrofac*, 687 F.3d at 675 (quoting the AAA Rules).[9] Thus, Defendants argue this is sufficient to establish that the parties agreed to arbitrate arbitrability here. Doc. 34, Defs.' Mot.,

---

[9] The specific provision quoted in *Petrofac* reads: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." 687 F.3d at 675.

15.

The Court agrees. First, it is worth noting that Plaintiffs formulate no response to Defendants' argument; rather, Plaintiffs focus solely on whether a valid arbitration agreement exists. *See* Doc. 41, Pls.' Resp., 10–11. And second, even if it can be assumed that Plaintiffs oppose Defendants' contentions, the Court finds no reasons to support such opposition. The arbitration clause here clearly incorporates the CPR Rules, which include the specific rules cited above. These rules almost mirror the equivalent AAA Rules that relate to an arbitrator's authority to decide issues relating to the scope of the arbitration agreement. And *Petrofac* held that incorporation of the AAA Rules was sufficient to establish "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability. 687 F.3d at 675. Thus, to stay in line with *Petrofac*, this Court holds that express incorporation of the CPR Rules establishes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. The issues regarding the scope of the arbitration provision shall be left for the arbitrator to decide.

C.  *Whether Defendants Waived Their Right to Arbitrate*

Plaintiffs' remaining argument is that even if there is a valid arbitration agreement between the parties, Defendants waived their right to arbitrate this dispute. Doc. 41, Pls.' Resp., 21–24.[10] Specifically, Plaintiffs argue that Defendants "willingly submitted to the judicial process by causing

---

[10] It's unclear if this is an issue for the Court or the arbitrator to decide. An unpublished Fifth Circuit opinion held that the waiver issue was for the court to decide when "the Agreement [did] not contain clear and unmistakable evidence of an intent to arbitrate the instant litigation-conduct waiver issue . . . ." *Vine v. PLS Fin. Serv., Incorp.*, 689 F. App'x 800, 804 (5th Cir. 2017) (per curiam) (internal quotations omitted) (citing *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 221–22 (3d Cir. 2007)). The court held that the arbitration agreement's "silence" of the waiver issue was not sufficient to show "clear and unmistakable evidence." *Id.* Here, the Court is uncertain if incorporation of the CPR rules is sufficient to show that the parties intended to delegate the waiver issue to the arbitrators. The parties do not litigate this point, but instead seemingly assume it is for the Court to decide. Regardless, because litigation-conduct waiver is "presumptively for the court to decide," the Court will do so. *Id.* (quoting *Ehleiter*, 482 F.3d at 221).

Fiduciary Network to initiate litigation in the New York Supreme Court regarding allegedly arbitrable issues . . . ." *Id.* at 21. Plaintiffs contend that Defendants "should have caused Fiduciary Network to arbitrate its claims against Hurley instead of filing suit" in New York. *Id.* at 22. In response, Defendants stress that they were not parties to the New York action; they note that the suit was only between Fiduciary Network and Hurley. Doc. 42, Defs.' Reply, 9.

The Court finds that this point alone is sufficient to defeat Plaintiffs' waiver argument. "Both Delaware and federal law recognize a strong public policy in favor of arbitration." *Anadarko Petro. Corp. v. Panhandle E. Corp.*, 1987 WL 13520, at *8 (Del. Ch. July 7, 1987) (citations omitted). "As a result, although a party may waive its right to compel arbitration, such waiver will not be lightly inferred, and any doubts should be resolved in favor of arbitration." *Id.* (internal citations omitted). "For a party to be found to have waived its right to arbitrate, it must have actively participated in a lawsuit or taken other action inconsistent with the right to arbitration." *Falcon Steel Co. v. Weber Eng'g Co., Inc.*, 517 A.2d 281, 288 (Del. Ch. 1986). Delaware courts have noted "[s]uch conduct includes initiating a lawsuit instead of proceeding to arbitration, actively participating in discovery, and unreasonably delaying in requesting arbitration." *City of Wilmington v. Wilmington FOP Lodge # 1*, 2004 WL 1488682, at *7 (Del. Ch. June 22, 2004). Here, the only conduct on Defendants' part that Plaintiffs have alleged is that because Defendants "now control and manage Fiduciary Network," they "should have caused Fiduciary Network to arbitrate its claims against Hurley . . . ." Doc. 41, Pls.' Resp., 21–22. But Plaintiffs cite to no cases where a Delaware court found similar conduct to be either "active participation" in litigation or actions inconsistent with arbitration, such as participating in discovery or initiating a lawsuit. While Defendants may have been Fiduciary Network's directors, they were not named and did not appear in the New York lawsuit. Additionally, that suit involves

Fiduciary Network's claims against Hurley for conduct that occurred after the forced-sale process. These claims appear distinct from Hurley's claims here, and thus further attenuate the argument that the Defendants waived their individual right to arbitrate Hurley's claims. Because waiver is not lightly inferred and all doubts are resolved in favor of arbitration, *Anadarko Petro.*, 1987 WL 13520, at *7, the Court rejects Plaintiffs' waiver argument.

**IV.**

**CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Compel Arbitration and Stay Proceedings (Doc. 31). The action is **STAYED**, and the Clerk of Court is instructed to administratively close this case pending arbitration. The parties are **ORDERED** to provide joint status updates every six months, with the first report due on **April 24, 2020**.

**SO ORDERED.**

**SIGNED: October 25, 2019.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE